IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:24cr296-MHT |
| | ) | (WO) |
| DORON CARTARIUS MITCHELL | ) | |

OPINION AND ORDER

In this criminal case, the main issue is whether the court should suppress a gun seized during a stop and frisk of a defendant who was carrying the gun, concealed, while he was in a public area. The rub is that Alabama permits individuals to carry concealed guns in public areas.

Defendant Doron Cartarius Mitchell was indicted on a single count of possessing "a Glock model 22 Gen 5, .40 caliber pistol converted to fully automatic by way of a Machinegun Conversion Device," in violation of 18 U.S.C. § 922(o). Indictment (Doc. 1) 1. He has since moved to suppress the gun, claiming that it is the fruit of an unconstitutional seizure. The United States Magistrate

Judge conducted an evidentiary hearing and now recommends that the motion be granted; the government objects to that recommendation. After an independent and de novo review of the record (including a video of part of the relevant events and a transcript of the evidentiary hearing), the court's findings of fact, inferences to be drawn from those findings, and conclusions of law are as follows.

## I. BACKGROUND

On New Year's Eve of 2023, an event was held at the 'Riverfront' in Montgomery, Alabama. The Montgomery Police Department beefed up security throughout the area; weapons were prohibited inside the event, and a checkpoint was placed at the event's entrance. Armed individuals who tried to go through the checkpoint were turned away and told that weapons inside the event area were not permitted.

The police also used a security camera system to monitor areas around the checkpoint, with one camera

placed inside a tunnel near the checkpoint.  That tunnel had three exit points: the north side of the tunnel, which exited toward the event and checkpoint; a stairway in the middle of the tunnel, which exited into a plaza and away from the event; and the south side of the tunnel, which exited into the street and away from the event.

Around 40 minutes before midnight, Lieutenant Donald Lowe began observing defendant Mitchell through the tunnel camera feed.  Because a video of the relevant portions of that feed was introduced at the evidentiary hearing, the court was able to see what Officer Lowe saw.

The tunnel was filled with people walking toward the event or waiting inside.  For example, a group of people with heavy jackets was waiting around a bench; some of them had their hands in their jacket pockets and were looking around while they waited.  Mitchell was in the tunnel, standing by himself, pacing and talking on the phone.  Lowe then noticed, through the feed, that Mitchell had a bulge in his sweatshirt pocket, the outline of which looked like a handgun with an extended

clip.  This concerned Lowe because, if a gun went off in the tunnel, it would likely injure many people.

After Mitchell's call ended, he continued waiting inside the tunnel.  He put one hand in his sweatshirt pocket (the pocket with the suspected gun) and smoked a cigarette with the other.  About a minute and half later, he smiled at someone.  Soon after, a woman he appeared to know walked by him, and he gave her a fist bump and a hug.  He then made a brief phone call when she left.

When Mitchell's second call ended, he stood around for a little while, before taking out his phone to text someone using both his hands.  Once he finished texting, he sat on a nearby bench, put one hand in his sweatshirt pocket, and used his phone with the other.  A short time later, he stood up, put his phone away, and placed both hands in his pocket.  He then seemingly recognized some people and briefly talked to them.  When they left, he recognized someone else and dapped him up as he walked by.  Afterward, he went back to waiting with one hand in his pocket and his phone in the other.

4

Around this time, Officer Lowe, concerned about the threat to public safety created by having an armed individual in a crowded tunnel, called Lieutenant Bryson Gambill.  Lowe told Gambill that there may be someone with a gun in the tunnel and asked him to "send someone over just to ensure that everything's okay and that there--there's no criminal activity going on."  Tr. Vol. 1 (Doc. 43) 19:4-6.  Gambill personally went over to investigate.

Shortly after Officer Gambill was dispatched, Mitchell started walking away from the event and toward the south end of the tunnel.  Around the same time, Gambill began walking toward Mitchell from the south end. As their paths were about to cross, Gambill asked Mitchell to stop and chat, but Mitchell ignored Gambill. Seconds later, Gambill seized Mitchell, put him against the wall, and searched him.

Gambill found a pistol that was illegally modified into a machine gun in Mitchell's sweatshirt pocket.

Mitchell was arrested and later charged with possessing a machine gun in violation of 18 U.S.C. § 922(o).

## II. THE STOP

### A.

In essence, the government argues that the magistrate judge incorrectly found that the police did not have the reasonable suspicion required to stop Mitchell.

The Fourth Amendment provides, in part, that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. Ordinarily, for a search or seizure to be reasonable, the government must obtain a warrant issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id. See also Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized an exception that allowed for a limited seizure and attendant limited search (also known as a 'stop and frisk') under certain circumstances.  The Court later summarized these circumstances: "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity," *United States v. Cortez*, 449 U.S. 411, 417 (1981), or that the "person is wanted for past criminal conduct."  *Id.* at 417 n.2.  And, incident to a valid stop, officers may conduct a frisk of the stopped person if they have "reasonable suspicion that the person[] temporarily detained [is] armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009).

For an officer to have the reasonable suspicion to sustain a stop, he must be able to point to specific, "articulable facts that criminal activity 'may be afoot.'"  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).  He "must be able to articulate something more than an 'inchoate and

7

unparticularized suspicion or hunch.'" *Id.* (quoting
*Terry*, 392 U.S. at 27) (internal quotations omitted).
When determining whether an officer had the required
reasonable suspicion, the court must look at the totality
of the circumstances based on the evidence that the
officer had at the time of the stop. *See United States
v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989).

To be sure, "[t]here is nothing in the Constitution
which prevents a policeman from addressing questions to
anyone on the streets." Terry, 392 U.S. at 34 (White,
J., concurring). However, it is settled that, "when an
officer, without reasonable suspicion, ... approaches an
individual, the individual has a right to ignore the
police and go about his business." *Illinois v. Wardlow*,
528 U.S. 119, 125 (2000).

### B.

Therefore, Officer Gambill had the right to approach
and question Mitchell about the concerns he and Officer
Lowe had, but he did not have the right to seize Mitchell

(that is, temporarily stop him for questioning) and then search him (that is, frisk or pat him for weapons) *unless* he initially had a reasonable suspicion that Mitchell was, or was "about to be, engaged in criminal activity," *Cortez*, 449 U.S. at 417, or was "wanted for past criminal conduct." *Id.* at 417 n.2. Otherwise, Mitchell had the "right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125.

The critical issue here is whether Officer Gambill had the right to seize Mitchell.

The government asserts that Officer Gambill had a constitutional right to seize Mitchell, albeit only temporarily, for a number of reasons. First, the government contends that Mitchell was in a public place and had what looked like a handgun with an extended clip in his sweatshirt pocket. As the magistrate judge correctly recognized, these facts do not provide reasonable suspicion that Mitchell was, or was "about to be, engaged in criminal activity" was "wanted for past criminal conduct." *Cortez*, 449 U.S. at 417 & n. 2. It

is undisputed that it is generally legal in Alabama for an individual to carry a handgun, open or concealed, in most public places. *See* R. & R. (Doc. 48) 4 (discussing Ala. Act 2022-133 (codified in scattered sections of Ala. Code §§ 13A-11)). At the time Officer Gambill stopped Mitchell, Officers Lowe and Gambill had no evidence to overcome this general legality. For example, they had no evidence that Mitchell was a felon forbidden to possess a gun. Nor did they have evidence that the gun itself was illegal; the evidence does not reflect that an extended clip, by itself, signified that the gun was a machine gun. Simply put, for all that appeared to Lowe and Gambill, it was legal for Mitchell to have a concealed handgun on him.

Second, the government submits that Mitchell placed his hand in the pocket containing the apparent gun. As the seed video shows, Mitchell, like others around him, put his hands in his pocket during a cold night. Although his hand was in the same pocket as the suspected gun, it was, as stated, legal for him to possess a concealed

handgun.  He did not appear to be thumbing the trigger, pointing the gun at anyone, or doing anything else suggesting that he planned to use the gun to commit a crime.  These facts do not provide reasonable suspicion that Mitchell was, or was "about to be, engaged in criminal activity" was "wanted for past criminal conduct." *Cortez*, 449 U.S. at 417 & n. 2.  His behavior was completely legal.

Third, the government represents that Mitchell was wearing a "'memorial' shirt" from a death that occurred weeks before the event.  Gov't's Objs. (Doc. 49) at 4. The government, however, has not explained why this shirt is connected to criminal activity or suggested that Mitchell was engaged in such activity.  This fact does not provide reasonable suspicion that Mitchell was, or was "about to be, engaged in criminal activity" was "wanted for past criminal conduct." *Cortez*, 449 U.S. at 417 & n. 2.  His wearing of the shirt was completely legal and did not suggest any illegal activity.

11

Fourth, the government asserts that Mitchell appeared to be looking for somebody and seemed nervous or agitated. As evidence, the government points to the facts that he was pacing, appeared to be looking for someone, and that his knee was shaking. That Mitchell was sometimes pacing and appeared to be looking for someone reflects normal behavior, for others at the event were doing the same. Admittedly, Mitchell's knee was shaking but it was shaking up and down for only a few seconds when he was sitting down. And, far from agitated, he appeared relaxed; he was standing around, chatting with others, and hugging people he recognized. Moreover, even if his behavior may have looked suspicious, it would merely have "alert[ed] the officer to the need for continued observation." *Terry*, 392 U.S. at 34 (White, J., concurring). The touchstone here is not just "an 'inchoate and unparticularized suspicion or hunch,'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (internal quotations omitted), but "articulable facts

that criminal activity 'may be afoot.'"  *Id*. at 7 (1989)
(quoting *Terry*, 392 U.S. at 30).

Fifth, the government contends that Mitchell's
location was evidence of criminal activity because a
person walking to the checkpoint is more likely to be
unarmed than elsewhere.  The government's contention has
several problems.  For starters, Mitchell was not walking
to the checkpoint, he was waiting outside the checkpoint.
And waiting outside a checkpoint is not evidence of
criminal activity, for, as stated, in Alabama being armed
was generally lawful where Mitchell was located.  Plus,
it was not especially rare for people to be armed near
or at the checkpoint, for, as stated, some people came
armed to the checkpoint and were just turned away for
having weapons.  That was a purpose of the checkpoint.

Gambill also had no other reason to think that
Mitchell's location suggested criminality.  There is no
evidence that he was in a high crime area or that a
suspect matching his description recently committed a
crime in the area.

13

Sixth, the government represents that, when Officer Gambill approached Mitchell, Mitchell avoided eye contact, was evasive, and tried to get by Gambill after Gambill asked Mitchell to stop. These actions, by themselves, do not evidence suspicious conduct warranting the seizure of a person, for it is settled that a person approached for questioning by the police has "the right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125. In any event, according to Gambill, when Mitchell saw him, Mitchell did not change his pace or even switch directions to exit through the stairs and avoid Gambill; rather, Mitchell kept walking toward Gambill and just "a moment" after Gambill asked Mitchell to stop Gambill seized Mitchell and put him against the wall. Tr. Vol. 2. (Doc. 44) 22:16. As a result, Mitchell simply did not have the chance to get by Gambill.

Moreover, even if Mitchell had refused to stop for Gambill, his refusal would not have provided a reasonable suspicion "that criminal activity 'may be afoot.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30).

14

Officer Lowe acknowledged that the officers did not have reason to believe that Mitchell committed any crime prior to approaching him.[1]   Moreover, as stated, a person approached for questioning by the police has "the right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125.

Still, the government argues that, even if there were not enough evidence to provide reasonable suspicion of a crime, the stop was proper because Gambill was trying to protect public safety.   The government's argument misunderstands the reasonable suspicion analysis.   The Fourth Amendment does not permit police to seize someone solely because he might pose a potential threat to public safety.   *See Florida v. J.L.*, 529 U.S. 266, 272 (2000)

---

1. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)) (emphasis in original). That said, Lowe's testimony is relevant to the extent that his experienced assessment is evidence of whether there was objectively reasonable suspicion Mitchell was engaged, or about to engage, in criminal activity. *See Ornelas v. United States*, 517 U.S. 690, 699-700 (1996).

(rejecting a public safety and firearm exception to *Terry*'s reasonable suspicion analysis). Instead, it permits police to seize someone who they reasonably suspect is engaged in illegal activity.

Since Alabama law makes it generally legal to carry a firearm in public places, even crowded ones, police officers may not seize people in Alabama solely because they have a firearm in a public place. Police officers may not seize people even though allowing them to carry firearms in crowded public places creates an inherent danger. And while the Eleventh Circuit Court of Appeals has not decided this issue, every other circuit faced with the issue has concluded the same. *See*, *e.g.*, *United States v. Watson*, 900 F.3d 892, 895-96 (7th Cir. 2018) (Barrett, J.); *United States v. Brown*, 925 F.3d 1150, 1153-55 (9th Cir. 2019); *United States v. Wilson*, No. 23-30777, __ F.4th __, 2025 WL 1982767, at *5-*7 (5th Cir. July 17, 2025).[2]

---

2. The government also argues that Mitchell had no reasonable expectation of privacy, and thus the stop was reasonable. The reasonable expectation of privacy

The government makes one final argument. It maintains that, under Alabama law, even though individuals have a right to carry concealed weapons, several exceptions allow officers to seize weapons if they suspect someone is dangerous or engaged in criminal activity: Ala. Code §§ 13A-11-97 & 13A-11-98. Thus, the government argues that the stop was permitted under Alabama law.

The government is mistaken; the exceptions merely codify *Terry* and allow officers to temporarily take custody of a gun if they reasonably suspect someone is a danger to themselves or others. The exceptions do not support that a reasonable suspicion warranting seizure may be inferred from only an individual's armed presence in a public area. Otherwise, the exceptions to the concealed-carry right would subsume a significant part

_____

analysis is used, however, to determine whether items that "could not be subject to seizure at common law (*e.g.*, telephone conversations) [were] seized under the Fourth Amendment." *California v. Hodari D.,* 499 U.S. 621, 627 n.3 (1991)*.* That analysis does not apply to the seizure of persons. *See id.*

of that right, as armed presence in a public area is what
the right allows.   Because Gambill did not have a
reasonable suspicion that Mitchell was committing, or
about to commit, a crime or was a threat, beyond the fact
that he was armed in a public area, these exceptions do
not apply.

In conclusion, and from a
totality-of-the-circumstances perspective, the court
finds that officers similarly situated to Officers
Gambill and Lowe would have had only enough evidence to
reasonably suspect that Mitchell was carrying a concealed
firearm in a crowded public area.   While that activity
is inherently dangerous, it is something that people in
Alabama are generally allowed to do.[3]   And so, Gambill
was constitutionally permitted to investigate Mitchell,

---

3.   The government separately contends that the
magistrate judge was insufficiently deferential to law
enforcement when assessing the evidence.   But deference
is not given to officers when determining whether
reasonable suspicion existed.   *See Ornelas*, 517 U.S.at
698-99.   A court only gives due weight to the evidence
provided by officers.   *See id.*   Here, the magistrate
judge did just that.

follow him, and ask him questions to obtain more evidence. Gambill was not, however, constitutionally permitted to 'seize' Mitchell, and then perform a frisk. Because Gambill seized Mitchell anyway, Mitchell's right to be free from unreasonable seizures was violated.

### III. THE EXCLUSIONARY RULE

The court now turns to the government's objections about the exclusionary rule's application to this case.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' but 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'" *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). That said, to safeguard Fourth Amendment rights, the Supreme Court created the exclusionary rule, which prohibits the government from using evidence, obtained by violating the Fourth Amendment, in a criminal trial. *See, e.g., Mapp*

19

*v. Ohio*, 367 U.S. 643, 656-60 (1961). "[T]he *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement." *Davis v. United States*, 564 U.S. 229, 246 (2011) (emphasis in original).

Yet the exclusionary rule is strong medicine, potentially "letting guilty and possibly dangerous defendants go free." *Herring*, 555 U.S. at 141. Therefore, the Court also created a series of doctrines that tailor the rule to ensure that it "applies only where it 'result[s] in appreciable deterrence.'" *Id.* (internal quotations omitted). As part of that tailoring, the Court sometimes engages in cost-benefit analysis to determine whether to create exceptions to the rule or extend it to certain circumstances. *See Davis*, 564 U.S. at 236-39. In those *categories* of cases, where the rule's deterrent benefit does not outweigh its costs, it is not applied. *Id.* The government concedes that the evidence should be suppressed *if* the exclusionary rule applies to the initial stop. Thus, the only question is whether the rule should apply at all.

The government makes two arguments for why the exclusionary rule should not apply.

First, the government argues that the 'good-faith exception' applies because Gambill (1) relied on the previously discussed exceptions to Alabama's concealed-carry law and (2) did not engage in "misconduct by temporarily detaining a suspicious defendant concealing a weapon in a crowded area." Br. Opp'n (Doc. 31) 7.

The 'good-faith exception' is one doctrine that tailors the exclusionary rule to ensure it applies to only circumstances most in need of deterrence. As the Supreme Court has explained, "The extent to which the exclusionary rule is justified by [its deterrent effect] varies with the culpability of the law enforcement conduct." *Herring*, 555 U.S. at 143. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. When a

Fourth Amendment violation is caused by deliberate, reckless, or grossly negligent police conduct, the benefits of exclusion typically outweigh its costs. *See id.* Exclusion may also be justified when a violation is caused by "recurring or systemic negligence." *Id.* "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (quotations and citations omitted). The good-faith exception applies in those circumstances.

Contrary to the government's assertion, the good-faith exception does not apply here.

To begin, Officer Gambill did not reasonably rely on the exceptions to Alabama's concealed-carry law. As explained above, the exceptions are inapplicable to this case, and Gambill had no reason to believe that the exceptions applied when he stopped Mitchell.

22

The evidence also reflects that Officer Gambill engaged in 'misconduct,' as he deliberately violated the Fourth Amendment.  For one, Officer Lowe, acknowledged that police had no evidence that Mitchell was engaged in criminal activity before Gambill approached him.  Gambill also did not testify that he believed the police had evidence of criminal activity before stopping Mitchell. Instead, when Gambill was asked whether he had "any reason to think [Mitchell] was about to commit a crime," Gambill responded that "[he] wouldn't know until [he] talked to [Mitchell]."  Tr. Vol. 2. (Doc. 44) 8:21-23.

While Gambill may have had a good reason for wanting to violate the Constitution, that reason does not make the violation any less deliberate.  The good-faith inquiry focuses not on an officer's reasons for the seizure, but "whether a reasonably well trained officer would have known that the [seizure] was illegal in light of all of the circumstances."  *Herring*, 555 U.S. at 145 (quotations omitted).  Such an officer would have known that seizing Mitchell was illegal.

23

Second, the government contends that the exclusionary rule should not apply because its deterrent benefits do not outweigh its costs *in this case*. The government asserts that the court must conduct a cost-benefit analysis to decide whether to apply the exclusionary rule on a case-by-case basis, and that suppression is not justified here because Gambill was trying to protect public safety.

The government misunderstands how the exclusionary rule's cost-benefit analysis works. The analysis is not done by deciding "whether a *particular* police officer would benefit from specific deterrence or whether a *particular* defendant would be costly to release." *United States v. Nicholson*, 24 F.4th 1341, 1353 (11th Cir. 2022) (emphasis in original). Rather, it is done by looking at cases *categorically* to decide whether to apply the rule to certain categories of cases. *See id.*

As a result, the court will construe the government to be arguing for an exception permitting the use evidence obtained from an unconstitutional seizure if the

seizure was done to protect public safety.  However, to the extent that the government seeks a 'public safety' exception, *Terry* is that exception.  *See* 392 U.S. at 27-31.   *Terry* permits the government to use evidence seized based on reasonable suspicion rather than pursuant to a warrant supported by probable cause precisely because of public safety concerns.  *See id.*  An exception any broader would swallow the rule, as police could always persuasively argue that public safety justifies an unconstitutional search or seizure.   *Cf. J.L.*, 529 U.S. at 272-73.

## IV.  CONCLUSION

The court truly appreciates the police officers' public-safety concerns that an individual with a concealed gun was present in a crowded public area.  It may even be reasonable to suspect that someone in their early 20s, as was Mitchell here, with a concealed firearm in a crowded public area may make a reckless decision,

because people around that age, whose brains have not yet fully developed, often act recklessly.

However, Alabama has permitted people to carry concealed firearms without a permit, thus subjecting Alabamians to the inherent dangers associated with that permission. Those dangers include that people likely to make reckless decisions are permitted to have guns in crowded public areas. Neither the police, nor this court, may rewrite Alabama law no matter the dangers it permits. It is for the people of Alabama to rewrite the law should they no longer wish to live with its consequences. Because Officer Gambill did not reasonably suspect that Mitchell's possession of a concealed gun posed a danger greater than that which Alabama law permits, his seizure violated the Fourth Amendment.

***

Accordingly, it is ORDERED that:

(1) The government's objections (Doc. 49) are overruled.

(2) The recommendation of the United States Magistrate Judge (Doc. 48) is adopted.

(3) The motion to suppress (Doc. 23) is granted.

(4) All evidence obtained because of the unlawful seizure of defendant Doron Cartarius Mitchell is suppressed.

DONE, this the 13th day of August, 2025.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE